## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MICHAEL TEUFEL,                          Case No. 1:12-cv-355

      Plaintiff,
                                         Judge Timothy S. Black
vs.

PRINCETON CITY SCHOOL DISTRICT
BOARD OF EDUCATION, *et al.*,

      Defendants.

### ORDER THAT: (1) PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 23) IS GRANTED; and (2) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 24) IS DENIED

This civil action is before the Court on the parties' cross motions for summary judgment (Docs. 24, 26) and responsive memoranda (Doc. 30, 31, 32, 33).

## I.      BACKGROUND FACTS

Plaintiff Michael Teufel filed this civil action against Defendants[1] alleging that his constitutional rights were violated when Defendants denied him access to the public forum of the public comment portion of the public meeting of the Princeton Board of Education held on April 12, 2012.  Plaintiff claims that he is entitled to an award of nominal damages for the violation of his fundamental constitutional rights, together with a declaratory judgment that such action by the Defendants did, in fact, violate his constitutional rights.  Additionally, Plaintiff requests that the Court issue a permanent injunction that enjoins the Princeton Board of Education from denying any resident of the

---

[1] Defendants include Princeton City School District Board of Education ("Board") and Steven Moore, president of the Princeton Board of Education (collectively, "Defendants").

Princeton City School District the right to speak during the course of the public comment portion of any regular meeting of the Princeton Board of Education based upon the viewpoint of the comments such individual makes or is anticipated to make during that portion of such meeting.

## II.     PLAINTIFF'S UNDISPUTED FACTS[2]

1.      Plaintiff Michael Teufel (aka Mick Teufel) is a resident and taxpayer in the Princeton City School District, located in Hamilton County, Ohio.  (Doc. 1 at ¶ 18).

2.      Defendant Board of Education of the Princeton City School District is, pursuant to Section 3313.17 of the Ohio Revised Code, a body politic and corporate.  (Doc. 1 at ¶ 8; Doc. 9 at ¶ 8).

3.      The duties of the Board of Education includes, *inter alia*, the formulation and approval of policies for the Princeton City School District, as well as the general oversight of the operations of the Princeton City School District.  (Doc. 1 at ¶ 8; Doc. 9 at  ¶ 8).

4.      The Board bears responsibility for the existence of the policies challenged in this litigation.  (Doc. 1 at ¶ 8; Doc. 9 at ¶ 8).

5.      Defendant Steven Moore is a member of the Board of Education and, at all times relevant in this litigation, served as the president of the Board of Education.  (Doc. 1 at ¶ 9; Doc. 9 at ¶ 9; Doc. 21 at 6).

6.      The Board of Education has formally adopted various policies which provide, *inter alia*, the following:

a. Policy No. 0148 provides that "[t]he Board President functions as the official spokesperson for the Board."  (Doc. 1 at ¶ 10; Doc. 9 at ¶ 10).

b. Policy No. 0169.1 provides that the Board of Education of the Princeton City School District "shall provide a period for public participation at every regular meeting of the Board."  (Doc. 1 at ¶ 15; Doc. 9 at ¶ 15).

---

[2] *See* Docs. 27, 30.

c. Policy No. 0169.1 provides that "[t]he presiding officer of each Board meeting at which public participation is permitted shall administer the rules of the Board for its conduct." (Doc. 1 at ¶ 12; Doc. 9 at ¶ 12).

d. Policy No. 0169.1 acknowledges and recognizes "the importance of allowing members of the public to express themselves on school matters of community interest." (Doc. 1 at ¶ 16; Doc. 9 at ¶ 16).

7. The public participation or public comment portion of the meetings of the Board of Education is a designated period of time at each regular board meeting which is included as an agenda item for each such meeting. (Doc. 21 at 21-22).

8. In order for a member of the general public to speak during the public comment portion of the meetings, an individual desiring to speak must fill out a form which identifies his or her name and the subject matter that he or she intends to discuss. (Doc. 21 at 16-18).

9. Prior to proceeding with the public comment portion of the meetings of the Board of Education, the presiding officer of the meeting typically reads aloud a statement of the general ground rules for such participation which are: (i) the time limit for an individual's comments, *i.e.*, 3 minutes; (ii) for the speaker to identify himself or herself; (iii) that a person desiring to speak during the public comment portion of the meeting must reside in the school district; and (iv) not to mention people by name or use inappropriate language. (Doc. 21 at 10-11).

10. According to Steven Moore, the "recognition of visitors", *i.e.*, the public comment portion of the meetings is a minor part of the agenda. (Doc. 21 at 27-28).

11. Since January 1, 2009, during the public comment portion of the meetings, Plaintiff addressed or attempted to address the Board at a total of 6 meetings, *viz.*, the meetings held on: (i) March 14, 2011; (ii) April 1, 2011; (iii) May 2, 2011; (iv) March 12, 2012; (v) April 12, 2012; and (vi) May 7, 2012. (Doc. 21, Ex. 2).

12. The Board of Education approves the meeting minutes of the regular Board meetings and the characterization of the topics that Plaintiff addressed at such meetings. (Doc. 21 at 76-77).

13.     The official minutes of the meeting of the Board of Education held on
        March 4, 2011, characterized Plaintiff's comments during the public
        comment portion of that meeting as follows: "Mick Teufel expressed
        concern over administrative support at Princeton High School."  (Doc. 21,
        Ex. 3).

14.     The official minutes of the meeting of the Board of Education on April 4,
        2011, characterized Plaintiff's comments during the public comment
        portion of that meeting as follows: "Mr. Mick Teufel expressed concern
        with the lack of collaboration and two-way communication with the school
        administration." (Doc. 1 at ¶ 21; Doc. 9 at ¶ 21, Doc. 21, Ex. 4).

15.     The official minutes of the meeting of the Board of Education held on May
        2, 2011, characterized Plaintiff's comments during the public comment
        portion of that meeting as follows: "Mr. Mick Teufel expressed concerns
        over student safety matters."  (Doc. 21, Ex. 5).

16.     "Administrative support" which was discussed by Plaintiff at the board
        meeting on March 14, 2011, and "student safety" which was discussed by
        Plaintiff at the Board meeting on May 2, 2011, are different topics.  (Doc.
        21 at 74).

17.     Sometime between May 2, 2011, and March 12, 2012, Steven Moore spoke
        with the school district's attorneys and Gary Pack, the superintendent of the
        Princeton City School District, about Mr. Moore's ability, as board
        president, to prevent Plaintiff from addressing the board during the public
        comment portion of future Board meetings.  (Doc. 21 at 48-49, 53).

18.     At the time that Steven Moore consulted with his attorneys and Mr. Pack
        concerning his ability to prevent Plaintiff from addressing the board at
        future meetings, Plaintiff had addressed the Board during the public
        comment portion at only three different meetings.  (Doc. 21 at 55).

19.     Following Plaintiff's participation during the public comment portion of the
        meeting of the Board of Education held on March 12, 2012, Mr. Moore, in
        his capacity as president of the Board declared the following:

> Mr. and Ms. Teufel, we have heard your concerns and – about your experiences and your concerns about personnel systems, over the last – over the last year in mailings, telephone calls and six, now seven, meetings, as you mentioned. We consider this and these matters closed, and will not be allowing you to speak again at future meetings.  (Doc. 1 at ¶ 26; Doc. 9 at ¶26).

20.   When Steven Moore stated that "this matter is considered closed" during the meeting of the Board of Education of the Princeton City School District on March 12, 2012, Mr. Moore was referring to the discussion concerning the subject of Mrs. Teufel's experience at Princeton High School.  (Doc. 21 at 67).

21.   At the Board of Education meeting held on April 12, 2012, when the time for the public comment portion of that meeting arrived, Mr. Moore, in his capacity as president of the Board and on behalf of and as official policy of the Board, made the following declaration:

> Next item on the agenda is recognition of visitors. We only have one visitor request but I'm going to deny it. It was the request, was from Mr. Mick Teufel, since he informed me he was going to talk about- items that talked in the past, I think we've heard enough of that per our last statement. So, we're going to pass on that.  (Doc. 1 at ¶ 30).

22.   After Mr. Moore indicated that he would not permit Plaintiff to speak during the public comment portion of the Board of Education meeting held on April 12, 2012, the following exchange between Plaintiff and Mr. Moore on behalf of the Board ensued:

> Mr. Teufel: May I speak –
> Mr. Moore: well, no, but –
> Mr. Teufel: -- I have new information also, and I'd also like to get that information on the record
> Mr. Moore: You can put it on the record through – you can write a letter and let us know, Mick
> Mr. Teufel: Are you denying me my public speaking tonight?
> Mr. Moore: Per the statement that I read last meeting, the answer is "Yes".
> (Doc. 1 at ¶ 31).

23. With respect to the public comment portion of the Board of Education meeting held on April 12, 2012, Mr. Moore publicly declared his denial of allowing Plaintiff to speak during that portion of the meeting prior to Plaintiff making any public comment at such meeting.  (Doc. 21 at 24).

24. Mr. Moore and the Princeton School Board have posited the following as the reasons why they denied Plaintiff access to the public comment portion of the Board of Education meeting held on April 12, 2012, as well as the interest supposedly served by such denial:

a. conservation of "mind space, brain space from other things that [the school board members are] dealing with in meetings" (Doc. 21 at 100-01, 109-10);

b. the potential impact Mr. Teufel's statement could have on the operations on the school district (Doc. 21 at 102-04);

c. controlling the potential of a negative perception of the school district (Doc. 21 at 105-06);

d. the protection of school district employees' rights and reputations (Doc. 22 at 24); and

e. controlling the duration of the school board meetings (Doc. 22 at 24-25)[3]

### III. DEFENDANTS' UNDISPUTED FACTS[4]

1. The Board of Education is a political subdivision of the State of Ohio pursuant to Ohio Revised Code Section 3317.17.

2. The Board of Education has a public participation policy contained in its bylaws and policies at Policy 0169.1. This policy provides:

---

[3] Defendants only partially admit this statement, claiming that Plaintiff mischaracterizes the 143 pages of deposition testimony from Mr. Moore by choosing only a handful of the reasons and interests advanced/served/given by Mr. Moore as to why he, acting on behalf of the Board, denied Plaintiff access to the public comment portion of the April 12, 2012 Board meeting.

[4] *See* Docs. 24, 31.

The Board of Education recognizes the value to school governance of public comment on educational issues and the importance of allowing members of the public to express themselves on school matters of community interest.

The Board is also committed to conducting its meetings in a productive and efficient manner that assures that the regular agenda of the Board is completed in a reasonable period of time, honors the voluntary nature of the Board's time using that time efficiently, and allows for a fair and adequate opportunity to be considered. Consequently, public participation at Board meetings will be governed by the following principles:

In order to permit the fair and orderly expression of such comment, the Board shall provide a period for public participation at every regular meeting of the Board and publish rules to govern such participation in Board meetings.

The presiding officer of each Board meeting at which public participation is permitted shall administer the rules of the Board for its conduct.

The presiding officer shall be guided by the following rules:

A. Public participation shall be permitted as indicated on the order of business.
B. Attendees must register their intention to participate in the public portion of the meeting upon their arrival at the meeting.
C. Participants must be recognized by the presiding officer.
D. Each statement made by a participant shall be limited to three minutes duration, unless extended by the presiding officer.
E. The presiding officer may:

1. Prohibit public comments that are frivolous, repetitive and/or harassing;
2. Interrupt, warn, or terminate a participant's statement when the statement is too lengthy, personally directed, abusive, off-topic, antagonistic, obscene, or irrelevant;
3. Request any individual to leave the meeting when that person does not observe reasonable decorum;
4. Request the assistance of law enforcement officers in the removal of a disorderly person when that person's conduct interferes with the orderly progress of the meeting;

     5.   Call for a recess or an adjournment to another time when the lack of public decorum so interferes with the orderly conduct of the meeting as to warrant such action.

F. The time allotted for the portion of the meeting during which the public is invited to participation shall be limited unless extended by a vote of the Board.

3.     During the Board of Education meeting on March 14, 2011, Plaintiff addressed the Board of Education during the public participation session of the meeting.[5]

4.     On the visitor sign-in sheet completed by Plaintiff for the March 14, 2011, meeting, Plaintiff indicated that he wished to address "administrative support at Princeton High School" during his three minutes before the Board of Education.  (Doc. 24, Ex. B).

5.     The Board of Education meeting minutes from the same meeting indicate that Plaintiff "expressed concern over administrative support at Princeton High School."  (Doc. 24, Ex. B).

6.     Plaintiff's script used for addressing the Board of Education during the March 14, 2011 meeting indicates that he discussed an assault that occurred at Princeton High School when his wife was employed there, Princeton High School administration's treatment of the assault, the administration's treatment of his wife after the assault, the treatment of his wife during a pre-disciplinary meeting with the Human Resource Director, and allegations that the administration was trying to harass and intimidate his wife.  (Doc. 24, Ex. C; Doc. 25 at 31, 23-25).[6]

---

[5]  Plaintiff admits this statement but would characterize the event as the "public comment portion of the meeting" or the "public participation portion of the meeting."  Plaintiff claims that use of the term "session" is more a term of legal art, *e.g.*, the school board meeting in "public session" or "executive session."

[6]  Plaintiff maintains that prior to speaking at any meeting of the board, he prepared a script of his intended remarks from which he generally read when he made his comment.  (Doc. 25 at 31). While the script speaks for itself, the script itself does not contain any such "indication." Plaintiff admits that the script in question contains notes relating to an assault that occurred at Princeton High School when his wife was employed there, Princeton High School administration's treatment of the assault, the administration's treatment of his wife after the assault, the treatment of his wife during a pre-disciplinary meeting with Human Resources, Direct, and allegations that the administration was trying to harass and intimidate his wife.

7.    During the same meeting, Plaintiff's wife discussed "student safety concerns" as indicated on her visitor sign-in sheet.  (Doc. 24, Ex. D).[7]

8.    During the Board of Education meeting on April 4, 2011, Plaintiff, addressed the Board of Education during the public participation session of the meeting.  (Doc. 24, Ex. E).[8]

9.    On the visitor sign-in sheet completed by Plaintiff for the April 4, 2011, meeting, Plaintiff indicated that he wished to address "ideas to improve school safety" during his three minutes before the Board of Education. (Doc. 24, Ex. E).

10.   The Board of Education meeting minutes from the same meeting indicate that Plaintiff "expressed concern with the lack of collaboration and two-way communication with the school administration."  (Doc. 24, Ex. E).[9]

11.   Plaintiff's script used for addressing the Board of Education during the April 4, 2011 meeting indicates that Plaintiff mentioned that "respectful two-way communication about school safety was ignored by the Princeton High School administration", and that he discussed Princeton High School principal's handling of the assault situation, and communications that occurred between a human resources employee, the Princeton High School principal, and Plaintiff's wife.  (Doc. 24, Ex. F).[10]

12.   During the same meeting, Plaintiff's wife discussed "procedures used by Princeton administration" as indicated on her visitor sign-in sheet.  (*See*

---

[7]  Plaintiff admits this statement as it relates to the school board meeting of March 14, 2011.

[8]  Plaintiff admits this statement, although he would characterize the event as the "public comment portion of the meeting" or the "public participation portion of the meeting."  Plaintiff claims that use of the term "session" is more a term of legal art, e.g., the school board meeting in "public session" or "executive session."

[9]  Plaintiff admits this statement as it relates to the school board meeting of April 4, 2011.

[10]  Plaintiff maintains that prior to speaking at any meeting of the board, Plaintiff prepared a script of his intended remarks from which he generally read when he made his comment.  (Doc. 25 at 31).  While the script speaks for itself, the script itself does not contain any such "indication."  Plaintiff admits that the script in question contains notes relating to the topics listed in Paragraph 11 of Defendants' Proposed Undisputed Facts.

Doc. 24, Ex. G).[11]

13.    During the Board of Education meeting on May 2, 2011, Plaintiff addressed the Board of Education during the public participation session of the meeting. (Doc. 24, Ex. H).

14.    On the visitor sign-in sheet completed by Plaintiff for the May 2, 2011, meeting, Plaintiff indicated that he wished to address "additional thoughts and ideas on school safety at Princeton High School" during his three minutes before the Board of Education. (Doc. 24, Ex. H).

15.    The Board of Education meeting minutes from the same meeting indicate that Plaintiff "expressed concern over student safety matters." (Doc. 24, Ex. H).[12]

16.    Plaintiff's script used for addressing the Board of Education during the May 2, 2011 meeting indicates that Plaintiff mentions that during the last Board of Education meeting he "gave two examples of what [he] thought were missed opportunities to increase school safety", and that he went on to discuss that he would "share additional examples" of the same topics he previously discussed at prior Board of Education meetings. Plaintiff repeated that he had issues with Princeton High School based on "the combination of harassment, lack of respectful two-way communication, lack of administrative support, unanswered questions, an atmosphere of intimidation and important information not being shared…" (Doc. 24, Ex. I).[13]

17.    During the same meeting, Plaintiff's wife discussed "concerns about the referral process at Princeton H.S." as indicated on her visitor sign-in sheet. (Doc. 24, Ex. J).[14]

---

[11]  Plaintiff admits the statement as it relates to the school board meeting of April 4, 2011.

[12]  Plaintiff admits the statement as it relates to the school board meeting of May 2, 2011.

[13]  Plaintiff maintains that prior to speaking at any board meeting, he prepared a script of his intended remarks from which he generally read when he made his comment. (Doc. 25 at 31). While the script speaks for itself, the script does not contain any such "indication." Plaintiff admits that the script in question contains notes relating to the topics listed in Paragraph 16 of Defendants' Proposed Undisputed Facts.

[14]  Plaintiff admits this statement as it relates to the school board meeting of May 2, 2011.

18. The next time Plaintiff addressed the Board of Education during a regular meeting was on March 12, 2012. (Doc. 24, Ex. K).[15]

19. However, in the interim time period, Plaintiff submitted multiple correspondences to the Board of Education members regarding his and his wife's concerns. (Doc. 24, Exs. P, Q, and R).[16]

20. Plaintiff spoke with Board of Education members through a variety of avenues in between his appearances at the Board of Education meetings. These communications which addressed Plaintiff's concerns included "hours or telephone calls", "multiple conversations with the administration", "two memos [Plaintiff] sent to Board members", house visits, emails, etc. (*See* Doc. 21 at 54, 7-24).[17]

21. During the Board of Education meeting on March 12, 2012, Plaintiff's visitor sign-in sheet vaguely indicated that he wished to address "ideas for a better Princeton" during his three minutes before the Board of Education. (Doc. 24, Ex. K).[18]

---

[15] Plaintiff admits this statement, although he would characterize the event as the "public comment portion of the meeting" or the "public participation portion of the meeting." Use of the term "session" is more a term of legal art, *e.g.,* the school board meeting in "public session" or "executive session."

[16] Assuming the term "interim time period" refers to the period between May 2, 2011 and March 12, 2012, Plaintiff admits he had selective and limited communications to one or more members of the Princeton School Board and, specifically, those communications attached to Defendants' Motion for Summary Judgment as Exhibit P (directed only to Steve Moore), Exhibit Q (sent to the school board members), and Exhibit R (directed only to Steve Moore).

[17] Plaintiff admits that "in between his appearances at Board of Education meetings," *i.e.*, at times other than the regular board meetings, he had selective and limited communications to one or more members of the Princeton School Board. Plaintiff admits the following communications occurred in between his appearances at Board of Education meetings: a telephone conversation with Mr. Moore in December of 2011 (Doc. 25 at 10-11); an in-person meeting with Bob Maine (*Id.* at 11); a telephone conversation with Lillian Hawkins (*Id.* at 13) and a telephone conversation with Sandy Leach (*Id.* at 15); a letter to Steve Moore between May 2, 2011, and March 12, 2012 (Doc. 24, Ex. P); an e-mail sent to the Board on December 12, 2011 (Doc. 24, Ex. Q); and a letter sent to Steve Moore on or about November 11, 2011 (Doc. 24, Ex. R).

[18] Plaintiff admits that the visitor sign-in sheet reflects that he wished to address "ideas for a better Princeton" at the Board meeting held on March 12, 2012. (Doc. 24, Ex. K).

-11-

22.    The Board of Education meeting minutes from the same meeting indicate
       that Plaintiff "stated that one year ago he and his wife Mary expressed
       concerns over safety and discipline issues at Princeton High School.
       [Plaintiff] expressed concerns over the evaluation process of administrators
       at Princeton High School and the leadership within the building." (Doc. 24,
       Ex. K).[19]

23.    The Board of Education meeting minutes further indicated that the Board of
       Education President Steve Moore "stated that the Board has heard the
       concerns [of Plaintiff] through presentations at board meetings, written
       correspondence and telephone calls and now considers this matter closed
       and that further public participation will not be permitted on the subject."
       (Doc. 24, Ex. K).[20]

24.    The recorded video of the Board of Education's March 12, 2012 meeting
       which contains a verbatim record of the meeting indicates that Plaintiff
       discussed the following:

       "One year ago, Mary, my wife and former Princeton High School teacher,
       and I made our first of six presentations to the Princeton school board about
       our concerns with the Princeton administration. six presentations to the
       Princeton school board about our concerns with the Princeton
       administration, particularly the administration of Princeton High School.
       Through our presentations, emails and letters we shared with the board
       specific examples and supporting information about how we feel Mary was
       harassed and treated unfairly. We also pointed out what we thought were
       safety and discipline issues. For specific information, please refer to the
       videos of March 14, April 3, and May 10 of the school board minutes on the
       Princeton City Schools website.

       We'd received a letter from the Princeton board dated August 25, 2011. If
       the board feels that this letter addressed our concerns, we will need to agree
       to disagree. Recently I reviewed the evaluations of three of the
       administrators who we had concerns about. I was shocked at the extremely
       high ratings these administrators received. One of these administrators, who
       we highlighted in our presentations, received 137 excellent markings, the
       highest level possible out of 137 criteria. Another administrator received
       128 excellent markings out of 128 criteria. We believe that these

       ---

       [19]  Plaintiff admits this statement as it relates to the school board meeting of March 12, 2012.

       [20]  Plaintiff admits this statement as it relates to the school board meeting of March 12, 2012.

evaluations perpetuate the company line that all was okay at Princeton High School. We believe that the changes needed at Princeton High School require the realistic evaluation of administrators and genuine two-way communication between staff and administration. We feel that the actions and judgments of the administrators we observed certainly did not rate as excellent. We feel that the evaluation system is greatly flawed. There has been one consistency before, during and after the incidents described in our presentation. Some Princeton High School staff members have concerns and are afraid to express these concerns because they fear retaliation. We feel that Mary stands as an example of what happens to a staff member who expresses his or her genuine concerns at Princeton High School. There are two reasons why I'm presenting tonight. The first is once again to put our concerns on the public record. We feel this is the responsibility of an active citizen. Secondly, we care about the Princeton school district and we want to see a better Princeton. What do we want? Ideally, we'd like to see a change of leadership at the high school. We understand there's been some reorganization at the high school. However it appears that basically it's the same cast of administrators that remain. At the very least, we want the school board to find out what is really happening at Princeton High School. We also want the board to insist that the evaluation of administrators reflect reality."

25.  Mr. Moore responded to Plaintiff with the following: "Mr. and Mrs. Teufel, we have heard your concerns about your experiences and your concerns about our personnel systems over the last year in mailings, telephone calls and six, now seven, meetings, as you mentioned. We consider this and these matters closed and we will not be allowing you to speak again at future meetings." (Doc. 9 at ¶ 26).[21]

26.  For the April 12, 2012 meeting, Plaintiff's visitor sign-in sheet indicated that he wished to address "ideas for a better Princeton" during his three minutes before the Board of Education. (Doc. 24, Ex. L).[22]

27.  The Board of Education meeting minutes from the same meeting indicate that "there was one visitor registered to speak before the board, [Plaintiff]." (Doc. 24, Ex. L).[23]

---

[21]  Plaintiff admits this statement as it relates to the school board meeting of March 12, 2012.

[22]  Plaintiff admits this statement as it relates to the school board meeting of March 12, 2012.

[23]  Plaintiff admits this statement as it relates to the school board meeting of April 12, 2012.

29.   Prior to the start of the April 12, 2012 meeting, Moore indicated that Plaintiff responded that the was going to speak about the same materials he had previously, and that was all Mr. Moore needed to hear.[24]

31.   The following interaction occurred between Plaintiff and Mr. Moore which is captured on the video of the April 12, 2012 meeting which contains a verbatim record of the Board of Education: (Doc. 1 at ¶ 31).

Mr. Moore: Next item on the agenda is recognition of visitors. We only have one visitor request, but I'm going to deny it. It was, the request was from Mr. Mick Teufel. Since he informed me he was going to talk about items he talked in the past, I think we heard enough of that per our last statement. So we're going to pass on that.

Plaintiff: UH, excuse me. Can I speak?

Mr. Moore: Well, no.

Plaintiff: I have new information also and I'd also like to put that information on the record.

Mr. Moore: You can put in on the record through uh, you can write a letter to us and let us know, Mick.

Plaintiff: Are you denying me my public speaking tonight?

Mr. Moore: Uh, per the statement that I read last meeting, the answer is yes.

32.   Mr. Moore felt Plaintiff was being repetitive and was in violation of Board of Education Policy 0169.1 and decided that he had to make the dire decision … of not letting … [Plaintiff] speak". (Doc. 21 at 65, 11-25).[25]

---

[24] Plaintiff admits that Mr. Moore indicated the foregoing, although Plaintiff disputes that was, in fact, his exchange with Mr. Moore. "[Mr. Moore] asked me, is this going to be about personnel issues in the past or something or is this going to be the same thing, and I said its going to be some of the past issues and new information." (Doc. 25 at 53).

[25] Plaintiff admits that Mr. Moore indicated "we" felt (though not identifying the "we") that he had "to make the dire decision, me, of not letting, you know, Mr. Teufel speak, because at some point we needed to do something." (Doc. 21 at 65). However, Plaintiff disputes this is the bona fide reason for the action, as Mr. Moore acknowledged he denied Plaintiff from speaking during the public comment portion of the meeting on April 12, 2012, due to the viewpoint or content of Plaintiff's anticipated statements. (*Id.* at 24). Further, Plaintiff claims he could not have been repetitive because he never had the opportunity to speak. (*Id.* at 24).

## IV.   STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56©.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (1986).

## V.   ANALYSIS

### A.   First/and or Fourteenth Amendment Protection

The right to free speech is not absolute, especially when a would-be speaker seeks access to government property as a platform for his speech.  The extent to which the government may regulate speech in this setting depends on the context of the speech and the government's reasons for restricting the speech.  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).  Government's regulatory powers are at their

weakest in the traditional public fora like parks and streets and at their strongest in

nonpublic fora like military bases.  The school board meeting at issue in this case falls in

the middle and is considered a designated or limited public forum, because the

government has intentionally opened it for public discourse, but "the State is not required

to . . . allow persons to engage in every type of speech" in the forum.  *Good News Club v.*

*Milford Cent. Sch.*, 533 U.S. 98, 106 (2001).

Defendants argue that Plaintiff's comments during the public participation sessions

of the Board of Education meeting were repetitive, and therefore Defendants did not

infringe upon Plaintiff's First and/or Fourteenth Amendment rights when they denied

Plaintiff the ability to address the Board of Education during the public participation

session of the April 12, 2012 meeting.

Board of Education Policy 0169.1 is a time, place, and manner restriction.  *Ivy*

*Featherstone v. Terry Boyd*, No. 06cv111, 2007 U.S. Dist. LEXIS 24901 (S.D. Ohio Mar.

22, 2007).  "While a speaker may not be stopped from speaking because the moderator

disagrees with the viewpoint he is expressing, it certainly may stop him if his speech

becomes irrelevant or repetitious."  *Id.* at 9-10 (citing *White v. City of Norwalk*, 900 F.2d

1421, 1425 (9th Cir. 1990)).

> A school board meeting, when opened to the public, is a limited
> public forum for discussion of subjects relating to the operation
> of the schools.  *See City of Madison Joint Sch. Dist. No. 8 v. Mis.*
> *Employment Relations Comm'n*, 429 U.S. 167, 175-76 (1978).
> When a school board sits publicly to conduct public business and
> to hear the views of citizens, it may not discriminate among

> speakers on the basis of the content of their speech, although it
> may confine its meetings to specified subject matter. *Id.*
> Furthermore, the government may place limitations on the time,
> place and manner of access to such forums, so long as the
> restrictions are content neutral and narrowly tailored to serve a
> significant governmental interests. *See Perry Educ. Ass'n v. Perry
> Local Educatiors' Ass'n*, 460 U.S. 37, 45-46."

*Featherstone*, 92 Fed. Appx. 279, slip op. at 5.

Since the type of public participation session before the Board of Education is

considered a limited public forum, any regulations must be: (1) content-neutral;

(2) narrowly tailored to serve a significant governmental interest; and (3) leave open

ample alternative channels for communications of the information. *Clark v. Cmty. for

Creative Non-Violence*, 468 U.S. 288, 293 (1984). With respect to a content-neutral time,

place or manner restriction on speech, "[t]he government bears the burden of proving that

its regulation meets" the standards required thereunder. *Billboard Co. v. City of Toledo*,

690 F.Supp.2d 651, 666 (N.D. Ohio 2010). "[T]he government must come forward with

some quantum of evidence, beyond its own belief in the necessity for regulation, that the

harms it seeks to remedy are concrete and that its regulatory regime advances the stated

goals." *Pagan v. Fruchey*, 492 F.3d 766, 771 (6th Cir. 2007).

Rules and regulations found to be reasonable time, place and manner restrictions

on speech include: requiring prior notification of the board, establishing fixed time

limitations, or empowering the board to terminate speech which is profane, abusive,

inflammatory, repetitive or disruptive. *Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d

427 (6th Cir. 2009) (upholding pre-meeting sign-up, 5-minute time limit, and restriction of repetitive comments).  These rules and regulations have been found to be reasonable in order to balance the competing interests of the speaker and his audience with the interests of the board of education in conducting its meetings in an orderly and efficient manner. *Id.*

In *Lowery*, the Court held that after a topic had been discussed one time before the Board of Education, the Board could prohibit a second discussion of the same topic when the speech would be (1) "harassing" because it threatened legal action and contained derogatory comments about personnel and (2) "repetitive" because the speaker and topic were the same.  *Id.* at 431.  Notably, the public participation policy at issue in *Lowery*, which was found to be constitutional, is markedly similar to Board of Education Policy 0169.1 at issue before this Court.  However, unlike the Board in *Lowery*, the Princeton School Board specifically "provide[s] a period for public participation at every regular meeting of the Board" which is included as a specific agenda item at each regular meeting.  (School Board Policy No. 0169.1; Doc. 21 at 21-22; Doc. 22 at 9).[26]

In order to determine if Policy 0169.1 is constitutional the Court will address whether it is: (1) content neutral; (2) narrowly tailored; and (3) leaves open ample alternative channels for communication.

---

[26] The school board policy at issue in *Lowery* simply provided a means by which individuals could request and be granted permission to be added to the agenda for a particular meeting to address a particular subject; public participation or comment was not a part of the meeting agenda.  *Lowery*, 522 F.Supp.2d 983 at 986.

**B.      Content Neutral**

"Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'"  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  "The principal inquiry in determining content . . . neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."  *Id.*

As explained *supra* at Section V.A., a Board of Education Policy that permits the exclusion of repetitive or harassing speech at a meeting has been held to be content neutral.  Additionally, the Policy's stated justifications of "allowing members of public to express themselves on school matter of community interest"; "assures that the regular agenda of the Board is completed"; and "honors the voluntary nature of the Board's time and us[es] that time efficiently" (Doc. 24, Ex. A), have previously been held to be content-neutral, because they have nothing to do with the subject of an individual's proposed speech, but involve conducting orderly, productive meetings.  *Lowery*, 586 F.3d at 433.

Defendants claim that Plaintiff's comments were repetitive of the comments he had made at numerous prior meetings, specifically three meetings in 2011 and the meeting in March 2012.  Following Plaintiff's statement during the public comment portion of the meeting of March 12, 2012, Mr. Moore declared that "we have heard your concerns and – about your experiences and your concerns about personnel systems, over

-19-

the last – over the last year in mailings, telephone calls and six, now seven, meetings, as you mentioned.  We consider this and these matters closed, and will not be allowing you to speak again in future meetings."  (Doc. 1 at ¶ 26).  However, the official minutes of the Board meetings characterized Plaintiff's comments as: (i) at the meeting of March 4, 2011, "express[ing] concern over administrative support at Princeton High School" (Doc. 21, Ex. 3); (ii) at the meeting of April 4, 2012, "express[ing] concern with the lack of collaboration and two-way communication with the school administration" (Doc. 1 at ¶ 21; Doc. 21, Ex. 4); and (iii) at the meeting of May 2, 2011, "express[ing] concerns over student safety matters.'  (Doc. 21, Ex. 5).  Additionally, Plaintiff's statement during the March 12, 2012 meeting reveals that his comments included criticism directed at what he perceived to be overly generous evaluations of school administrators.  (Doc. 24 at 5-6).[27]

The Court is particularly troubled by the fact that it had been ten months since Plaintiff had spoke at any Board meeting when Mr. Moore determined at the March 12, 2012 meeting that Plaintiff would not be allowed to speak again at future meetings.  (Doc. 21 at 48-52).  Moreover, although Plaintiff indicated twice that he wished to speak about "new information" during the public comment portion of the April 12, 2012 meeting, Mr. Moore refused his request.  Plaintiff's visitor sign-in sheet indicated he was going to discuss "Ideas for a better Princeton", which Defendants allege was the same discussion point from the March 12, 2012 Board meeting.  (Doc. 24, Ex. L).  Mr. Moore saw each of

---

[27] The evaluations had not previously been available and therefore could not have been an issue that was previously raised.  (Doc. 31 at 7-8).

these discussions, including April 12, 2012, to be "all related" and therefore "repetitive." (Doc. 21 at 75).  However, Mr. Moore acknowledged that he prohibited Plaintiff from speaking "based upon what [he] perceived or anticipated [Mr. Teufel] was going to say, the content of what he was going to say."  (Doc. 21 at 24).

> Q.      . . . [Y]ou prohibited [Mr. Teufel] from speaking at the school board meeting [on April 12, 2012,] based upon what you perceived or anticipated he was going to say, the content of what he was going to say?
>
> A.      Yeah . . .

(Doc. 21 at 24).

> Q.      The decision to prohibit Mr. Teufel from speaking whatsoever at the April 12th, 2012 meeting was based upon the content of what the board perceived he was going to say, correct?
>
> A.      On what he said he was going to say . . .

(Doc. 22 at 84).

On its face, the Policy is content neutral – the question however is whether the Policy was content neutral as applied.  Although the school board may exclude some types of "harassing" speech if it has the potential to disrupt the meeting, or threatens illegal acts, the board may not exclude speech merely because it criticizes school officials. *Police Dep't of City of Chicago v. Mosley*, 408 U.S 92, 96 (1972).  While members of the School Board claim to have prohibited Plaintiff from speaking at the April 12, 2012 meeting because his statements were repetitive, the undisputed facts establish that the School Board actually prohibited Plaintiff from speaking because of the viewpoints he wished to express.

-21-

A facially constitutional time, place, or manner restriction will be unconstitutional as applied where the restriction is content neutral on its face but has been applied in a viewpoint specific manner.  An as applied challenge to a content-neutral restriction on the "time, place, or manner" of public speech is evaluated under the standards set forth in *United States v. O'Brien*, 391 U.S. 367 (1968).

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 376-77.

### C.    Narrowly Tailored To Further Substantial Government Interests

Narrow tailoring does not mean that a time, place, or manner regulation must be the least restrictive or least intrusive means of achieving the government interest involved.  Rather, this prong is satisfied so long as the regulation does not "burden substantially more speech than is necessary to further the government's interests."  *Ward*, 491 U.S. at 799.

The Policy's stated justifications include "allowing members of the public to express themselves on school matters of community interest"; "assures that the regular agenda of the Board is completed"; and "honors the voluntary nature of the Board's time and us[es] that time efficiently."  (Doc. 24, Ex. A).  These justifications revolve solely around conducting orderly, productive meetings.  Thus, the Policy as written allows

almost all speech except when it is likely to interfere with the Board of Education's interests in efficient and productive meetings. "Unstructured, chaotic school board meetings not only would be inefficient but also could deny other citizens the chance to make their voices heard." *Lowery*, 586 F.3d at 433. The Sixth Circuit has held that a school's policy is narrowly tailored when it prohibits "repetitive'harassing" or 'frivolous" speech. *Id.*

However, to establish the actual existence and advancement of a substantial government interest when Defendants excluded Plaintiff from speaking during the public comment portion of the meeting on April 12, 2012, "defendants must do more . . . than 'assert[] interests [that] are important in the abstract.'" *Saieg v. City of Dearborn*, 641 F.3d 727, 736 (6th Cir. 2011). In light of the three-minute time limitation imposed upon all individuals who speak during the public comment portion of any regular meeting of the Princeton School Board, it begs the question, what interest was actually being served by denying Plaintiff the opportunity to speak. When confronted with this inquiry, Mr. Moore stated:

> Q.   No. I'm just trying to figure out why in April of this year you couldn't simply allow Mr. Teufel to get up, make whatever comments he wanted for three minutes, say thank you, and move on with your agenda? Can you answer than question?
>
> A.   What is the question?

Q.    Why were you not able to simply allow Mr. Teufel at the April 2012 meeting that occurred earlier this year, when you denied him the opportunity to speak, why not simply allow him to get up, make whatever comments he wanted to make for three minutes, as part of your policy in time limitations, and say thank you and move with the rest of the agenda?

A.    . . . His comments had the potential to be very highly impactful on our employees, our school district, and the time that it takes to deal with all that. The repetitive nature, the repetitive nature of hearing the same thing over and over again was of concern to us.  If you go back earlier in my deposition, I would stand by – I wish we could go back, I would repeat the whole thing over again.  That's why I did not let him speak.

(Doc. 21 at 34-35).

Additionally:

Q.    And in this instance on April 12th there was nobody else who wanted to speak during the public participation.  So if the board had let Mr. Teufel speak for three minutes, said thank you, then moved on to its agenda, he really would not have impacted really the duration of the meeting, it would not have become an excessively long meeting, correct?

A.    No.  Three minutes is three minutes.

Q.    Why not just simply let Mr. Teufel have his say for three minutes, thank you, you move on to the next subject?

A.    I think that's the issues that the board felt he would be presenting and that's why Mr. Moore denied that.  It had nothing to do with time.  It had something to do with how the meetings were moving and the information he continued to bring forward in that repetitive nature.

Q.    But the meeting was moving.  It would have just been a three minute statement, nobody else –

A.    That's at the direction of the president of the school board.

-24-

(Doc. 22 at 125).[28]

Even assuming *arguendo* that Plaintiff's comments were unduly repetitive, the universal imposition of a three-minute time limit on comments for all speakers arguably advances any interest related to maintaining an organized and time-efficient meeting. Moreover, in terms of the number of individuals who participate in the public comment portion of meetings, Mr. Moore acknowledged that "we don't get large numbers but sometimes you'll get one, two or three." (Doc. 21 at 10). On April 12, 2012, Plaintiff was the only individual who sought to participate in the public comment portion of the meeting. (Doc. 1 at ¶ 30).

While the Court finds that limiting repetitive, harassing, or frivolous language at a school board meeting does in fact advance legitimate government interests, such interests were clearly not advanced by prohibiting Plaintiff from speaking where, under the undisputed facts, he had not spoken in ten months, he claimed to be raising new issues, he was limited to three minutes, and no other individuals had asked to speak.[29]

---

[28] *See also* varying interests which were allegedly being served by the decision to deny Plaintiff access to the public comment portion of the school board meeting on April 12, 2012: (1) conservation of "mind space, brain space from other things that [the school board members are] dealing with in meetings" (Doc. 21 at 100-01, 109-10); (2) the potential impact Plaintiff's statement could have on the operations on the school district (*Id.* at 102-04); (3) controlling the potential of a negative perception of the school district (*Id.* at 105-06); (4) the protection of school district employees' rights and reputations (Doc. 22 at 24); and (5) controlling the duration of the school board meetings (*Id.* at 24-25).

[29] Furthermore, Defendants fail to address how imposing an absolute ban on Plaintiff's speech during the public comment portion of a regular meeting, and doing so prior to Plaintiff making any comments, is not substantially broader than necessary to advance its alleged interests. *Bays v. City of Fairborn*, 668 F.3d 814, 823 (6th Cir. 2012) ("[a]lthough a regulation may satisfy the [narrow-]tailoring requirement even though it is not the least restrictive or least intrusive means of serving the state's goal, it must not be substantially broader than necessary.").

Accordingly, the Court finds that the Policy is content neutral on its face, but, under the undisputed facts, the Policy was applied in a viewpoint specific manner with respect to Plaintiff. Prohibiting Plaintiff from speaking at the April 12, 2012 meeting based on the viewpoints he wished to express is a violation of his constitutional rights.

### D. Alternative Channels For Communication

Any time, place, and manner restriction must leave open ample alternative channels by which speakers can communicate their messages, although speakers are "not entitled to [their] best means of communication." *Phelps-Roper v. Strickland*, 539 F.3d 356, 372 (6th Cir. 2008).

Defendants argue that when precluded from speaking at the Board meeting, Plaintiff had multiple alternative channels of communication including "hours of telephone calls", "multiple conversations with the administration", "two memos [Plaintiff] sent to Board members", house visits, emails, etc. (Doc. 21 at 7-24, 54). However, Defendants fail to consider the nature of the forum, *i.e.*, a meeting of a public body at which members of the community are also present and which is broadcast on cable television. (Doc. 22 at 40, 41, 109). The intended audience of those participating and speaking at a Princeton School Board meeting is not isolated to district personnel. "An alternative is not ample if the speaker is not permitted to reach the intended audience." *Saieg v. City of Dearborn*, 641 F.3d 727, 740 (6th Cir. 2011).

Defendants bear the burden of proving that its Policy meets the standards of a

content neutral time, place, or manner restriction. However, Defendants failed to adequately evidence how Plaintiff's alternative channels of communication would reach beyond the Board itself, to the community at large. Accordingly, Plaintiff did not have ample alternative channels by which to communicate his message.

In sum, Defendants have failed to prove that Policy No. 0169.1 was applied to Mr. Teufel in a content-neutral manner, was narrowly tailored to serve a significant government interest, and left open ample alternative channels to communicate the information. Thus, under the undisputed facts, Mr. Teufel's constitutional rights have been violated as a matter of law.

### E.     Nominal Damages

Plaintiffs in a civil rights action are entitled to nominal damages for the deprivation of their due process rights, even without proof of actual injury. *Carey v. Piphus*, 435 U.S. 247 (1978). "By making the depravation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed." *Id.* at 266. Thus, "[n]ominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages." *Hughes v. Lott*, 350 F.3d 1157, 1162 (11th Cir. 2003). *See also Wolfel v. Bates*, 707 F.3d 932, 934 (6th Cir. 1983) (affirming award of nominal damages for violation of prisoner's First Amendment rights). Nominal damages, although not of

-27-

great monetary value, are a formal recognition that Plaintiff has been wronged.

Accordingly, this Court awards Plaintiff $1,000.00 in nominal damages.  *See also Crue v.*

*Aiken*, 370 F.3d 668 (7th Cir. 2004) (affirming district judge's award of nominal damages

of $1,000 for violation of plaintiffs' First Amendment rights arising from a prior restraint

on speech by university).

      **F.**     **Injunctive Relief**

      Plaintiff also requests that the Court consider the issuance of a permanent

injunction to ensure that the Princeton Board of Education complies with the mandates of

the Constitution during the public comment portion of its meetings.  In the First

Amendment context, demonstration of a First Amendment violation is often dispositive of

whether an injunction should issue.  *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288

(6th Cir. 1998) (finding that "when a party seeks a preliminary injunction on the basis of

the potential violation of the First Amendment, the likelihood of success on the merits

often will be the determinative factor").  Thus, in order to ensure future compliance with

the First Amendment by the Princeton Board of Education, a permanent injunction shall

and does hereby issue forbidding the Princeton Board of Education from denying any

resident of the Princeton City School District the right to speak during the course of the

public comment portion of any regular meeting of the Princeton Board of Education

based upon the viewpoint of the comments.

## VI.    CONCLUSION

Accordingly, for the reasons stated herein, there being no genuine dispute as to any material fact, and Plaintiff being entitled to judgment as a matter of law, Plaintiff's motion for summary judgment (Doc. 23) is **GRANTED** and Defendants' motion for summary judgment (Doc. 24) is **DENIED**.

(1)    Mr. Teufel is entitled to declaratory judgment that, in denying him the right to speak during the public comment portion of the school board meeting on April 12, 2012, Mr. Moore and the Princeton School Board violated Mr. Teufel's First Amendment rights; and

(2)    The Court grants nominal damages of $1,000.00 to Plaintiff, jointly and severally against the Defendants; and

(3)    Plaintiff shall submit a proposed Order of Permanent Injunction for the Court's review, copy to Defendants, within **14 days** of the date of this Order.

(4)    Plaintiff shall submit his verified claim for recovery of attorney fees and costs, if any, within **14 days** of the date of this Order.

**IT IS SO ORDERED.**

Date:  January 11, 2013               *s/ Timothy S. Black*
                                       Timothy S. Black
                                       United States District Judge